In the Matter of ERNEST G. METCALFE, an Attorney, Respondent.

First Department, March 27, 1936.

*Einar Chrystie,* for the petitioner.

*Charles M. Sheafe, Jr.,* of counsel, for the respondent.

MARTIN, P. J.  On April 22, 1932, there was filed in this court a petition charging respondent with misconduct as an attorney and counselor at law, to which petition he answered, and the matter was referred to a referee on May 27, 1932.

After a number of hearings, respondent's counsel took the position that the referee was disqualified to act as such because he had served as president of the petitioner for the period May 1, 1929, to May 1, 1931, and while acting as such president he had appointed members of the petitioner's committee on grievances. During this period the petitioner's grievance committee had conducted hearings which led to the charges herein.  However, his former official position with the petitioner did not disqualify him. Disqualification attaches to members of the grievance committee and the executive committee.  (*Matter of Jones,* 159 App. Div. 782.) The referee had never been a member of either committee.

The petition sets out four specific charges.  The referee concluded in effect that the fourth charge should not have been made. Our examination of the record leads us to the same conclusion and, therefore, no further reference will be made to the fourth charge.

The substance of the first two charges, which are similar in character, will be first given consideration.  In January, 1925, Percy N. Furber, respondent's friend and client, gave him $5,000 to be used for the purpose of purchasing stock in Furber's behalf, and the further sum of $2,000 to be used for the purpose of purchasing a stock interest in Ross Stores, Inc., to be held for the joint account of Furber and respondent; the respondent did not use any part of the money for the purposes stated and converted the entire amount to his own use; under date of July 3, 1925, he wrote Furber, as follows:

"To confirm our understanding — twenty-five shares of Hoff Vending Corporation stock standing in my name upon the company's books is to be issued to me upon my return to New York — are your property.

"On the Ross Stores underwriting the issuance of this stock is planned for the middle of September. We are joint account on two hundred shares of preferred valued at Two thousand Dollars and two hundred common (the bonus stock), and the Two thousand Dollars cash used in payment thereof has been advanced by you and you are entitled to repayment of this before distribution of the profits."

It is charged that the statements in this writing, to the effect that there were twenty-five shares of Hoff Vending Corporation stock standing in respondent's name on the books of the company, and that the issuance of the stock on the Ross Stores underwriting was planned for the middle of September, and that the $2,000 cash which had been previously given to the respondent by Furber had been used to pay for an interest in said underwriting, were all untrue; that the respondent subsequently did procure twenty-five shares of Hoff Vending Corporation stock from a friend in exchange for stock of the Trans-Lux Daylight Picture Screen Corporation, which he owned; that the Trans-Lux stock which he delivered to his friend in exchange for the Hoff stock was worth much less than $5,000; that he has not repaid to Furber any part of the $5,000 received from him, as above stated, and that it was not until December, 1926, after Furber's claim against respondent had been the subject of an arbitration, that the respondent finally paid him the amount awarded by reason of his conversion of the $2,000 given to him to be used for the Ross Stores investment.

The referee reports that in neither of these transactions was the relation of the parties that of attorney and client; that they were purely business transactions — in the Hoff Vending Corporation case for Furber's benefit, and in the Ross Stores case a speculation or investment for their joint account.

The petition charges conversion of the $7,000. The record, in our opinion, does not justify such a serious charge, considering the relation of the parties. These were not the only transactions between the parties at the time. Counsel for the petitioner consistently endeavored to confine the record to these two ventures, but there is more than sufficient evidence before us as to the informality of their dealings to sustain the conclusion that respondent was not so restricted; that results were looked for and, in accomplishing what was desired, he could take liberties without being accused of questionable acts. Mutual accounts were maintained, subject

to final adjustment, which were checked at intervals by representatives of the parties. Respondent's testimony is that he was at all times financially able to respond to any demand by Furber.

As to the stock of the Hoff Vending Corporation, the record makes it clear that Furber was anxious to acquire some of it; whether this was because of respondent's recommendation of it as an opportunity to make money or because of Furber's hope that through his ownership thereof he could get in contact with the Wrigley interests in Chicago and bring them into his Trans-Lux company, is immaterial. The fact is that he was willing to pay $5,000 for twenty-five shares. The stock was closely held. Respondent's testimony is that he endeavored to buy the twenty-five shares for $5,000 cash but the individuals from whom he sought to purchase refused to sell; that thereafter he proposed an exchange of stock owned by him in the Trans-Lux company for that of the Hoff Vending Corporation and this exchange was carried through in November, 1925, and Furber in due course received the stock in the Hoff Vending Corporation which he desired. We interpret the record transfer of 588 shares of the Trans-Lux stock on February 21, 1925, into the name H. A. Shields as corroborative of respondent. It was respondent who surrendered the certificate in the fall of 1925 and received in its place a certificate for 735 shares of the new stock, which petitioner's counsel conceded was exchanged for the Hoff Vending Corporation stock. Respondent urges that the February transfer was in contemplation of the eventual exchange. There is no other explanation in the record. The value of the Trans-Lux stock at the date of the exchange is a debatable question. There is sufficient in the record to indicate that the value of the number of shares exchanged exceeded the amount received from Furber by respondent.

With reference to the Ross Stores stock venture, which was to be a joint speculation or investment, respondent concedes this stock was not purchased but maintains this was because of inadvertence due to pressure of affairs in connection with the Trans-Lux company financing. Respondent's testimony is that Furber took the position that the latter business was the more urgent. Furber's testimony as to this conflicts with that of respondent. Consideration of all the circumstances indicates that the probabilities are with respondent's version.

The first two charges come finally to alleged misrepresentations contained in the letter given by respondent to Furber of July 3, 1925. The petitioner contends that the statement to the effect that the twenty-five shares of stock of Hoff Vending Corporation were standing in respondent's name on the books of that corpora-

tion, was untrue. The referee found that the statement was false. There is no doubt that the statement did not strictly state the facts. Respondent's testimony is that Shields had agreed to the exchange and was waiting for Atwater's consent, but that was not the equivalent of having stock in his name on the books.

The petitioner contends that the statement in the letter regarding the Ross Stores transaction is false, and the referee found that it was intended to deceive Furber. Respondent's testimony is that he had completely forgotten that the Ross Stores stock had been issued in April; that he did not mean that the $2,000 advanced by Furber had actually been used for purchasing the Ross Stores stock, but what he meant was " and the Two thousand Dollars used by Mr. Furber in payment thereof had been advanced by Mr. Furber and (he is) entitled to payment thereof."

Respondent's testimony as to the circumstances under which this letter was written is as follows: " I was getting ready to board the *Majestic*, and my chauffeur and my nurse and my baby, my wife and her sister, were waiting downstairs in my automobile to take me to the ship, my chauffeur had come upstairs and my wife asked me to hurry, because we had so much luggage to get on board, and I had on my hat and was standing at the entrance of the elevator." Respondent's testimony is that his intention was to protect Furber in case anything happened to respondent while he was in Europe. It may well be that Furber's checks would have been ample protection but there is plausibility to respondent's testimony and we are not convinced that he intended to deceive Furber. Nor do we believe that Furber was in fact deceived, considering his records. The parties continued their relationship until the fall of 1926, when differences arose and an arbitration was had. Respondent paid Furber $23,674.75 within twenty-four hours after the arbitrator made his award. Furber claimed and received the profit he would have realized had respondent carried through the Ross Stores stock venture, and also charged interest on the amounts advanced. General releases were then exchanged by the parties.

The third charge against respondent grows out of Furber's association with Harvey Fisk & Sons. This brokerage firm was handling the marketing of the stock of Furber's Trans-Lux Company. Through an investment of $200,000 respondent became a special partner of the brokerage firm, but as such special partner he was in fact representing one Maurice E. Davis (a director of the Trans-Lux company) and Furber, each of whom had invested $100,000. At the time of this investment Furber also loaned $55,000 to F. Clark Thompson, one of the general partners of the firm, which Mr. Thompson contributed to the firm capital.

Contemporaneously with the investment and loan, Mr. Thompson made an agreement with respondent under which the latter was to receive a sum equal to two and one-half per cent of Mr. Thompson's share of the profits of the brokerage firm during the year 1926. Furber's position is that when it was proposed to him that he invest in the firm he was advised by friends that he would receive four per cent of the profits, but respondent represented that the best he could get was two and one-half per cent; that he, Furber, knew nothing of the agreement between respondent and Thompson which, in effect, deprived him of a proper return on his investment. The petitioner's emphasis is on the fact that throughout this transaction respondent acted as attorney for Furber and Furber relied upon respondent to protect his interests. Respondent's testimony is that this agreement was intended to compensate him for services rendered to Thompson and that he told Furber, as well as Davis, about it. Davis testified that respondent told him of it at the time. The letter of January 10, 1927, from Davis to respondent, when read in its entirety, is not contradictory of this testimony. Davis gave further testimony of a meeting with Furber shortly after their going into the Harvey Fisk & Sons investment and this testimony indicates that Furber knew of the agreement. The petitioner suggests that Davis' testimony is inspired by the fact that respondent owes Davis $25,000 and that the prospect of collecting this amount will not be enhanced by disciplinary action against respondent. We are not persuaded that this indebtedness would induce Davis to testify falsely. There appears to be no reason why Davis should be told of the agreement and not Furber. The money respondent was to receive was to come out of Thompson's share of the firm profits. Furber was not deprived of anything through this arrangement, and the referee in fact found that Furber was not prejudiced nor did he suffer any loss by reason of the special agreement. Our reading of the record leads us to find that the agreement was not made without Furber's knowledge.

We find that the third charge, which involves the professional conduct of respondent, is without basis. The first two charges involve purely business transactions. The informality of the non-professional relations between respondent and Furber was conducive to laxity, but the evidence fails to clearly establish that respondent was dishonest or guilty of fraud or deceit.

We are constrained to comment on the history of these charges. The acts complained of took place in 1925. Furber, the main witness against the respondent, admittedly had knowledge of the facts with reference to the first two charges in the summer of 1926. If we accept his denial of knowledge of the so-called secret agree-

ment, which is the basis of charge No. 3, the record shows that in the summer of 1926 he had at least notice which should have put him upon inquiry. The parties went to arbitration in the fall of 1926 and while the arbitration was pending Furber's new attorney allowed it to become known that charges before the Bar Association were contemplated. It is clear that the coercive effect of such conduct was intentionally desired. On November 9, 1926, what is referred to as the " long affidavit," setting out at length the facts which are the basis for the first two charges and addressed to the Bar Association, was sworn to by Furber in the office of his new attorney, but this affidavit was not presented to the Bar Association at that time by either Furber or his new attorney. In January, 1926, the new attorney was given a copy of the so-called secret agreement by the attorney for the Thompson estate. Nothing was done about it then. In fact nothing was done about anything until June, 1928, when Furber became incensed because of respondent's association with a claim against Furber's company, and then the information as to the first and second charges was presented to the petitioner. Although the record leaves no doubt as to the fact that Furber and his new attorney then had full knowledge of the so-called secret agreement, nothing was done with reference to making it the basis for the third charge until November, 1929, when it is now claimed the secret agreement was first discovered. The first and second charges were brought to the attention of the petitioner's grievance committee in June, 1928, and the third charge November 22, 1929. The charges herein were not formulated and presented to this court until April, 1932. Meanwhile, petitioner's grievance committee held many hearings at which the complaining witness, Furber, was represented by a staff of attorneys who apparently conducted the proceedings. Had it been honestly believed that there was reasonable cause to prefer charges, action should have been taken promptly. The delay in presenting the information to the petitioner from November, 1926, to June, 1928, makes the good faith of the complaining witness more than questionable and lends credence to the charge that the present proceeding is attributable to vindictiveness.

The proceeding should be dismissed.

O'MALLEY, TOWNLEY and GLENNON, JJ., concur.

Proceeding dismissed.